Second case on our docket, which is Zen Magnets v. Consumer Product Safety. This is 19-1168, and we'll hear first from Appellate's Counsel. Good morning, Your Honors. This is Janie Lilly on behalf of the Consumer Product Safety Commission. And assuming that you can hear me, I will begin. Your Honors, it's well established that the same decision-maker may participate in multiple proceedings on the same subject. And the fact that a decision-maker has reached a conclusion in one proceeding and even stated that conclusion in strong terms does not render the decision-maker constitutionally barred from proceeding in the second proceeding, even if the second proceeding involves the same or similar issues. And that's all that happens here. Plaintiffs point to statements that were part of the agency's official rulemaking proceedings, statements made at the hearing where commissioners voted in favor of the rule, or their written versions of those statements posted on their websites, in which the commissioners explain their reasoning for voting in favor of the rule, and those statements mirrored the agency's official explanation for the rule that was published in the Federal Register. The plaintiff also points to a statement in a Department of Justice press release about an adjudication and a favorable district court decision enforcing one of the commission's orders. The statement said nothing more than the commission's position in that litigation. So the only statements that have come up are those that were part of official agency actions, and those cannot form the basis for constitutional violation by participating in the second proceeding. The fact that there may be some similarity or overlapping subject matter is at no moment, as this court and the Supreme Court have said, adjudicators, be they judges or agency's officials are presumed to be people of conscience who can set aside decisions made as properly as part of one proceeding in order to adjudicate a second proceeding. And on this point, Your Honor, I would invite the court, if it hasn't, to review the video that is cited of the hearing that's cited in our brief, where it's clear that the statements that form the basis of a plaintiff's objections were made as part of the agency's official rulemaking responsibilities, and similarly to review the adjudication that forms almost 50 pages in our joint appendix where the commission reviewed independently the evidence and the legal arguments involved in the adjudication. With that, Your Honor, I stand ready for the court's questions. Okay. Thank you, counsel. Judge McHugh, do you have questions for counsel? My first question is on jurisdiction with respect to Zenn's cross appeal with respect to the Rule 59e challenge to the first 19 pages of the district court's ruling as an advisory opinion, and my question is, do you agree we have jurisdiction over that claim? No, Your Honor. The plaintiff hasn't challenged an adverse judgment in that respect. The plaintiff's challenge seems to be that the district court declined to vacate a portion of its earlier decision because it was moot once it reached a latter decision, and the court does not have jurisdiction to address that argument. Okay. And your position is that all of the commissioners, that none of the commissioners showed bias. Correct. Your Honor, yes, Your Honor, the plaintiff has pointed to statements made by three commissioners and suggested that those showed prejudgment of issues that came in the later adjudication, and our position is that none of those statements made by the commissioners constitutionally barred the participation of the commissioners in the adjudication. Okay. With respect to the... I'm going to get my commissioner. I think it's Alder or Adler. There was a lot of discussion of fear about the commissioner's own children and putting them to bed, and, I mean, does that show inappropriate? That doesn't sound like something that one would say in support of a rulemaking. Does those comments bother you at all? Your Honor, I believe the statements you're referring to were made by then Chairman Kaye, and those statements about the... were made, and if Your Honor viewed them in the context of the hearing, you'd see that those were in the process of addressing parents of a child who was a victim of a serious injury associated with magnets that were the subject of rulemaking, and Commissioner Kaye did express strong views about the gravity of the risk at issue in the rulemaking, but the expression of strong views the Supreme Court has held is not a basis for a constitutional rule that would bar the commission from performing its statutory duties. And here I'm quoting from the United States v. Morgan in the Supreme Court and in Lydickey, where the district court judge was sitting in criminal proceedings and had made very strong statements about the criminal defendant and about matters at issue in the proceeding, but that didn't suggest that the district court there or the secretary in Morgan couldn't put aside strong views on matters that were properly before the adjudicator in one proceeding in order to fairly resolve issues in a second proceeding. Thank you. Judge McHugh, do you have any additional questions? I do not. Okay. Thank you, Judge McHugh. Judge Iye, do you have any additional questions? You know, I do. I guess I'm wondering, I think you're arguing for a rule that you can... You're going to set aside your preconceptions to rule fairly in the second proceeding, but I'm wondering what if the commissioner just flat out says, I cannot be fair to this party or this company because of what I've seen here today. I mean, they just come out and say, I cannot be fair. And that's the first part of my question. And how did that not happen in this case? Your Honor, if a commissioner were to say, I simply cannot be fair, I can't, I'm blinded by something, then that would overcome the presumption, of course, that the agency adjudicator, no less than a judge, could put those facts aside. That's not at all what happened here. And in fact, Commissioner Adler said as much. She said, I am resolving issues related to the rulemaking and the adoption of an industry-wide standard for how these products can be manufactured and distributed safely, and that is, those involve separate questions from the adjudication of whether any individual products on the circumstances extant in the market can remain on the market safely or whether they constitute a substantial product hazard that must be remedied in ways in which the commission is authorized to remedy any such problem. So, Your Honor, the hypothetical that you posit is contemplated by the case law and by a presumption, and an individual commissioner who could not be fair and has stated as such would not, of course, be presumed to be fair. But that's entirely different from what happened here. Do you think that that's required? A flat-out statement that I cannot be fair? Because I'm wondering how, and when you look at these statements, they're indicating some feelings about the matter, right? And then they go on to say, but I can be fair. So, I guess I'm just trying to press you. Do you have to say I can't be fair? No, Your Honor, that is not the case. And we've, in the case law in this circuit and in the Cinderella case where the official has announced that they have prejudged or pre-committed to an outcome in a pending proceeding, those are the circumstances in which it is apparent that there is a prejudgment. But nothing of the sort happened here. Instead, what happened was there were issues that came before the commission as part of the rulemaking in which the commissioners had to and did take positions on as part of adopting a safety standard. And the fact that similar issues came up in a separate proceeding does not suggest that they prejudged them. In accordance with the Supreme Court's cases and this court's cases. Okay, thank you. Thank you, Judge Ide. Do you have any additional questions? No, I'm good. Thank you. Okay, I do have a few questions for you, Ms. Lilly. And I do want to start by following up on Judge Ide's question. Essentially, now for example, you mentioned Cinderella 2. Now in Cinderella 2 and in Stanton, we have cases where either the D.C. Circuit or our circuit has said that particular statements do cross the line under the Kennecott test or whatever the due process test is. But is it fair to say that those didn't create a demarcation, that it has to be that, cross that line? That you have to, in the context of an existing adjudication, write a letter to a newspaper that just completely destroyed one of the parties? Or that you have to, if there's a pending adjudication about whether or not someone is going to be dismissed, to specifically say that person should be dismissed when there's a pending adjudication? Something shy of that could cross the line and constitute a due process violation, couldn't it? It certainly would depend on the facts, Your Honor. I see that my time is coming to a close, and I'd like to reserve some for rebuttal. May I answer your question? Yeah, but just to put your mind at ease, and I hope that we've said this. If not, it's probably my fault. But once you said that you were through and that I turn to my colleagues to ask additional questions, Kevin, I'm hoping that her time stopped. It was my fault, but I'm hoping that her time should have stopped at that point. The first argument, we did not. The time just kept running, but, you know, I can stop it now for rebuttal. Well, I'll tell you what, this was my fault for not making that clear. And just for the third argument, once the attorney says, I'm through, and then we start asking additional questions, then your time should have stopped. So, counsel, I'm going to, I think that was completely my fault, so I am going to give you five minutes. And your time is not continuing to run. Kevin, did that? Sure, and I apologize to all counsel. Kevin, did that make sense? So, I'll let the, so I'll stop the clock and then. Not yet, yeah, her clock should stop now. It will put an additional five minutes on her time, because I'm approximating that we've spent about five minutes of asking her questions, through no fault of hers, once she said that she was through. Okay, so should I ring the bell twice at any point, or just let you? Yeah, not, yeah, not while she's, not while she's answering our additional questions at the end, so her time, her time is our, the panel's, not hers. Okay. Okay, sorry about that, Kevin, that was my fault. And so, so, I think you've hit the question, if you happen to remember what it is. I think your question, Judge Bechrach, was, are there other circumstances besides the precise statements at issue, in the Cinderella case, in which the statements would violate the due process clause? And I think. Right, right. The answer is, the court needn't resolve the precise parameters of that, because what was at issue in those cases were statements about the outcome of a pending adjudication, committing the agency decision-maker to an outcome, and we have nothing of the sort here. Here, we have very standard agency rulemaking proceedings, in which the agency officials explained their vote in favor of a rulemaking and the reasons for it, and a subsequent adjudication that may have involved related issues, but there's nothing in the rulemaking or in that DOJ press release that suggested an adjudication about whether certain products constituted a substantial product hazard, that that outcome was predetermined. Okay. So, Ed, I want to get into what circumstances could trigger crossing of the line. Now, the Kennecott test does include, essentially, not only the actual partiality, but the appearance that the person has prejudged the pending matter, right? Yes, Your Honor, and it found on the-and the court found on the circumstances in that case that there was no prejudgment by virtue of participating in two different official actions. Right. Right. And the same-the same obtains here. Right. And so, I want to ask you-it seems to me, and tell me if I'm misunderstanding this case, but I think that there's two dimensions to Zen's arguments. One is the statements that are made in the context of the actual rulemaking, and then you have the-your rejoinder on-based on your reiteration of Morgan, that's even strongly voiced opinions in the context of an actual rulemaking, don't necessarily cross the line in a due process. But there's a second argument that Zen Magnus has, and that is the statements that are issued through press releases or public statements after the rulemaking. So, I want to ask you a hypothetical that goes to Zen Magnus' second argument. Now, it-this is a hypothetical, but it is predicated on something that historically did happen, and that is, obviously, we did have an appeal on Zen Magnus' challenge to the rulemaking. And let's say-let's say that we had a member of that panel, either Justice Gorsuch, Judge Abell, or myself, that after that panel had issued a decision that one of us issued a press release a few days later and said something along the lines of the following, and it's a purely hypothetical. There was a technical violation under the-under the law, and that it is fortunate for Zen Magnus because Zen Magnus had put its profits above the rule of law and the safety of children. And then that judge is going to sit on this appeal. And so, in that case, would the Kennecott test have been violated? Would that judge, through that statement that was one of the statements that Commissioner Kaye had-similar to what Commissioner Kaye had made, would that have crossed the line? And several responses, Your Honor, if that's okay. The first is I want to clarify that-that to the extent that Zen Magnus has pointed to press releases or statements outside the rulemaking, there are really only one press release at issue, and that was issued by the Department of Justice in this case. The other things that Zen Magnus talks about are hearing-are statements at the hearing or written versions of those hearing-those hearing statements posted on the website. So, there's not an analogy here. The-the question whether a judge would issue a press release is, of course, different because agencies are charged with communicating with the public and explaining its rules, and in the instance of the Department of Justice press release quoted the agencies, you know, as a prevailing party in adjudication. And so, that would also be a difference here. I think, as we said in our brief, that a judge-judges do not issue press releases in the usual course, and so that might give rise to a question about why a judge did. But I would add that had a judge made that statement as part of a separate opinion, for instance, it would be strange for that to serve as a basis for recusal in a later case. But turning to the merits of the statement here, the statement of Judge Kay quoted in the DOJ press release mirrored not only the commission's position in the adjudication, but even the Committee of Disgorgement and the deterrence of depriving wrongdoers of ill-gotten gains. And here, I'm quoting from 170F-3 at page 1377. So, for all those reasons, it would be the hypothetical that you've posited is very different from the-from what happened here. And so, the lines-the constitutional lines that are drawn here make clear that the commission's participation-all of the commissioners who participated in the adjudication were not barred from doing so by their prior official actions. Okay. Thank you. But let me clear something up for myself, because I was a little confused about this. And it goes to something that you just said just a moment ago, Ms. Lilley, and that is that the vast majority of these statements were made during the actual rulemaking. Now, there was another statement that Commissioner Kay had made, and that was the one that Judge McHugh was talking about, about this impassioned statement about when he kisses his kids goodnight and, you know, puts them to bed at night. And you said in your brief that that was-involved the rulemaking. But when I look at the record, I think it's 272, I think, of the appendix. That statement is dated five days after the rule had been adopted. And it looks like a-you know, it's a written statement of Chairman Elliot Kay. It looked to me that it was after the rule had been adopted. And it looked to be a, you know, standard press release. But I must be confused. Your Honor, Chairman Kay made the statement in the live hearing. And if Your Honor were to watch that, the link is available in our opening brief. He made the same statement there to explain his vote in favor of the rule. And the statements were later posted on the website, Your Honor. But those statements were made as part of the decision to vote in favor of the rule. I see. Okay. Thank you very much. And so, I think you saved time for rebuttal. So, we'll hear from the appellate and the cross appellate. Thank you, Your Honors. Good morning. My name is David Jaffa, J-A-P-H-A. I represent Jan Magnits, and I'm prepared to argue on its behalf this morning. And I want to start by saying, although we don't believe the Littikin case applies here because it adjudicates a statute 455, nevertheless, the late Justice Scalia wrote as part of that opinion, something that I think is instructive and even will help with Judge Mackrak's hypothetical that he asked Ms. Lilly. There, Justice Scalia, the late Justice Scalia wrote, it is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that extrajudicial source is the only basis for establishing disqualifying bias or prejudice. It is the only common basis and not the exclusive one. Since it is not the exclusive reason, a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as bias or prejudice, because even though it springs from the facts of the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. Your Honors, that's what I suggest happened here. Ms. Lilly said these statements that were made by the commissioners were just part of their job. It's five and a half years since I filed the first motion in this case, pointing out to the commissioners, in essence, that I think they should proceed with some caution. And at the time, Chairman Burkle agreed with me, at least in terms of the rulemaking, as well as the adjudication. And as you all are aware, of course, there was a distinction, and I accept that distinction as a matter of law. However, because the commissioners made various statements along the way, including not just the egregious statement of Commissioner Kaye in March of 2016, both before Administrative Law Judge Metcalfe issued his opinion, but after Judge Arguello issued her opinion in basically an unrelated matter in terms of Zen Magnet's conduct in basically an unrelated matter, certainly the commissioners would say so, because if the adjudication is unrelated to the rulemaking, most certainly the penalty imposed upon Zen in the matter before Judge Arguello is certainly different. It's extraordinary that after being told, in essence, to act with some circumspection, the commissioners continued to speak. And having been counseled in this matter from the beginning, I will try to address Justice Judge Bacroft's, sorry about that, maybe I'm projecting it wrong, Judge Bacroft's hypothetical in this way. When I argued before the commission back in June of 2017, before they issued their final order in the case, I was under no illusion what would happen before I started arguing that morning, because I knew from the beginning what their positions were. And I knew that there was no way I could write anything in a brief or argue anything before them. And I had some pretty heated arguments with Commissioner Adler and Commissioner Kay regarding foreseeable use and the details for which we're not here today to discuss. But these things were, in fact, egregious, in my opinion, because they will certainly show a closed mind, a revocably closed mind as to the dangers, at least in the minds of the commissioners, without considering any of the evidence that we had put forth and that Judge Mettri, in a very detailed order, explained why he ruled the way he did. So to answer up the hypothetical, I disagree with Ms. Lilley that Judge Bacroft's hypothetical doesn't apply, because, and, you know, Judge Bacroft did hear the argument regarding the rulemaking, which was different than what we're here about today. But if, through some quirk of nature, I believe it would be, Judge Bacroft would have issued a press release regarding the substantive matter of the Magnus and, you know, what might have been at the time some due process issue regarding preconceived notions among the commissioners, I dare say that it would have been somewhat unusual. The press releases that the commissioners put forth are not part of the adjudicative or rulemaking process. They are, as Judge Bacroft correctly pointed out, after the fact. What is in the record, the register, the federal register, is part of the rulemaking on this rule. That's all part of the record. Whatever's said in there, fair game. But when they go outside, when they stand outside the courtroom, as it were, and make a press release, that, when it's done time after time after time, I believe it was Judge McHugh, and followed up by Judge I, regarding the personal statements about how they were protecting not just Americans, which may be part of the task of the Consumer Product Safety Commission, but their own, their very own children, now we're into a new area. And I believe that when one looks at the entire record here, not just parsing it to this point on this date or this point on that date, but you look at the conduct of the commissioners and ask the question, is it possible that the average person looking at this could expect a fair hearing on appeal? I don't think the answer could be anything other than no. And so, again, to address Judge Bacow's point about the two-pronged argument, we are not saying that there's anything inherently wrong with conducting the rulemaking at the same time as undergoing the adjudication. But one has to be careful, and they were not. They were not careful at all. And I had no doubt in my mind what would happen after the arguments. It's more like a hearing than an argument, frankly. That's how it's done. We give an opening for a number of minutes, and then the commissioners each had 10 minutes to ask questions. So that's how it was done. But the only question I had was why it took them so long to issue the final order, because I knew how it was going to go. And our disagreement with Judge Bacow is that Judge Bacow has formally excluded Commissioner Adler's statement. We believe he should have excluded Commissioner Kaye's as well, as well as Commissioner Robinson's, even though she's no longer in the commission for the reasons we explained in the brief, that at the time, it was a violation of due process. So I'm going to just address the jurisdictional issue, and that is, we believe we have jurisdiction, and I believe that the are inextricably intertwined. I believe it's in their fourth brief around page six or so, five or six. And regardless of that, whether they concede it or they don't concede it, we believe this court has jurisdiction for the reasons we mentioned in our brief. And further, we believe Judge Jackson, having reached the due process issue, should not have issued what we're calling an advisory opinion based on the APA. The APA, and of course he did, I mean, the order is vacated, we concede that point. Nevertheless, because the court reviewed the record, that is, Judge Jackson reviewed the record, it's there, and I believe that's inappropriate, because if something is unconstitutional, if there's a constitutionally processed violation, I'm not quite sure how then the proceeding overall is not arbitrary and capricious. And so that's basically, you know, I'm standing on the briefs at that point, but I believe that the commissioner's conduct here does cross the line as a whole. They were essentially warned and kept on going anyway, making personal comments about the dangers of the rare-earth magnets, small-earth magnets. We believe that it wasn't merely inappropriate, it was unconstitutional, and certainly there was no ways that magnets could feel comfortable that they would get a fair hearing on the appeal of Judge Mettri's order. So with that, I'm concluded. Okay. Okay. Thank you, counsel. So your, Kevin, so his clock stops at this point. Judge, do you have any additional questions? I do not. Judge McHugh, do you have questions? Yes. One of the things you, counsel talked about was that press releases are not part of the what we just heard from opposing counsel is that the press releases merely reiterated statements that were made during the rulemaking process that were otherwise public. So my question to you is, where it's a press release that is simply repeating what has already been said in the hearing, does that affect your analysis of whether it's somehow objectionable? Well, it doesn't affect my analysis because if they are basically congratulating themselves after a hearing, that is an out-of-court statement. I mean, it's extrajudicial. The fact that it might have quoted in part, but I think if the court takes the time to look at the statements made on the record in the hearing room and then later press releases, then that would answer the question. I don't think it's exact, number one, and number two, it's still inappropriate. Now, yes, the public can go and listen to those things, but even in the adjudication, that's why I quoted Justice Scalia, the late Justice Scalia, because there are times when even from the bench, a judge can say things that are not related to or not supported by the record, per se, based on personal feelings. And that same goes for when Commissioner Kaye issues a press release or is quoted by the press commenting on Judge Arguello's order and opinion in an unrelated matter relating to the magnets, when he knows that he could be called upon, either way, regardless of the appeal, he's going to be called upon to issue a final order in the Zen Magnet case, which was then pending. It was an issue. We were waiting for the order from a judgmentary. So, no, it doesn't change my view of the app. These are things that should not be mined as to what the evidence would be in the future. Well, I mean, I think if you look at the Commissioner's statement, you know, you keep focusing on Justice Scalia, but I'm pretty sure if he could speak to us from the grave, he'd be telling us to focus on what Congress intended for this process. And it's pretty clear that it's not disqualifying to have participated in a rulemaking to then participate in an adjudication on a subject matter as to a particular party like Zen. Would you agree with that? I would not. I would not agree with that, Your Honor. And here's why. Justice Scalia would have to quote the Constitution. We're not dealing with a statute. We're dealing with the due process codes. And we're dealing with fundamental errors. Let me interrupt you. So, under your argument, then, the way the administrative process is set up so that Commissioners who participate in a rulemaking, where they find a safety hazard, it would violate due process for any of those Commissioners to then participate in an adjudication on the same product. No, that's not what I'm saying, Your Honor. I'm saying that violates due process when they show evidence of the irrevocably closed mind regarding the product and their feelings about the product in and of itself. What they did is a technical matter. I can see that what they need to find for the rulemaking is one thing. What they have to do for the adjudication that they set forward to their vote is another thing. But once they begin to comment about their feelings beyond the evidence, that's when, I believe, you've crossed the line. Well, they have crossed the line, not you, Your Honor. They have crossed the line and evidenced an irrevocably closed mind of the kind that the Constitution forbids. Keep in mind, the language of the APA is that a challenge to a final rule can be either because of arbitrary and capricious or a constitutional infirmity. And that's why I answered the Court, Your Honor, in such strong terms when you asked me about the late Justice Scalia. Yes, he would ask us to look at the statute, but there's no statute to look at here. That's why his language and litigy, I believe, is so formative because litigy was the case to resolve the statute 455, the recusal statute. But that's not what we're dealing with here. We're dealing with pure due process as found by Judge Jackson, at least as to Commissioner Adler. And that is why it's important to make those distinctions and why the feelings of the commissioners that they express are what crossed the line. If they would have just said, you know, we found today X, Y, Z, based on our scientists here and on our epidemiologists here, and this is what we found, end of story. Now we move on to the adjudication. This rulemaking prevents the importation of SREMs. Now we move on to the adjudication where we're looking to have recalls. I honestly would have, I would like it maybe, but I don't think I'd have a legal argument there if we won't do process violation. But that's not what happened here. They expressed their feelings, which is human. I don't, you know, fault them for that, but it didn't give me any comfort as my client's advocate. Well, let me turn to Commissioner Adler. In the statements that you object her to, the commissioner states explicitly that he says he's passing judgment on whether the maggots present a substantial product hazard, but he can't comment on the case that he has not yet seen. It's not yet before him. I mean, he seems to be very clearly separating the rulemaking from the adjudication and reserving judgment on the adjudication. And that's where he should have stopped. He should not have gone on to talk about his fears. He should not have gone on to talk about saving the children, saving the world. He should have stopped there. That's the problem. That's why today, I'm not saying there's anything wrong inherently with doing these two things and guess Congress set it up that way and agencies do it all the time and the regulatory process requires it. I have no objection to that. But then in contemporary parlance, keep, hold your tongue, I think would be the polite way to say it. Stop. You've made your point. Don't project to me how you feel because I know how you're going to vote. And when you do that, and I don't know how you're going to vote based on a legal analysis, I know how you're going to vote based on the emotional analysis. And that is what is wrong. And if you look at all the statements that we're objecting to throughout the record, beginning in 2014, okay, and thereafter, that's another point. I mean, why is he even commenting on, why is Commissioner Kaye commenting on Judge Arguello's opinion? Well, he knows my objection. And then if you look at the record, I haven't talked about it, but I filed another motion before we...in the appeal to the commission. I think it's hard enough for the public to understand the administrative process in the sense that the commissioners become the appellate court, okay? But as far as we understand... I think you've answered my question and I'm a little worried about abusing the not counting this as part of your argument time. Fair enough. Judge McHugh, do you have any additional questions? No. I do want to just mention to counsel that although we try to be generous, this is the first time for all of us. We don't want to impair your ability to answer the judge's questions, but try to resist the temptation to go beyond answering the judge's questions. And that's not meant as any criticism. We're just trying to figure this out as we go along. I do have a couple of follow-up questions, and that is the comments that you made about Commissioner Kaye. Now, those are prefaced by saying...expressing sympathy for the parents of...I'll just call her AC. Her name is in the press release and in the hearing. Most heart-wrenching of all, one little girl, AC, was terribly hurt and lost forever. And that's when Commissioner Kaye goes into how he's putting his boys to bed. So let me ask you, with that as a backdrop, hypothetical. Let's say I'm a district judge and I'm sentencing a defendant convicted of the distribution of child pornography. And I say something along the following. This is a terrible crime. In deciding what is the appropriate sentence, I have to take into consideration the gravity of the crime. I'll call her an eight-year-old daughter. I do have a daughter. She's not eight. And every night I put her to bed, I read her a story, and I think, my gosh, there is so much terrible evil in the world, such as that was that a jury has found that the defendant has committed. And I am sentencing the defendant to an upward variance. I'm going to give the defendant life imprisonment. And the session ends, and then the defendant files a motion to vacate the sentence because the sentencing judge had crossed the line into a violation of due process under Kennecott. Have I, as the sentencing judge, crossed the line? Not yet. But if I knew on appeal of that sentence that you would, let's say you're in the District of Colorado, okay, or Oklahoma, any of the district courts in the 10th Circuit. But let's say I knew in advance that in my case, you would somehow, through some quirk of the city by designation on my panel on the 10th Circuit, I think I would be well within my right to then seek recusal of you if I were going to argue that you were predisposed against my crime. Fair enough. So let me ask you a different hypothetical. And that is, if I maintain myself as, again, continuing the hypothetical on a parallel track. So hypothetically, my sentence gets negated by the 10th Circuit or the 11th Circuit, whatever. And they say that I have, on an unrelated violation, I've improperly calculated the guideline rate. So the appellate court rebans to me to re-sentence the defendant. And now you call your 2255, your collateral challenge, whatever it is, and say, well, Judge Baccarat can't be fair because he's already expressed his opinion. Have I, is my sitting on that case to re-sentence the defendant, is that a violation of due process? I'll concede, Your Honor, that's a very tough question. I would say it is probably because you were the sentencing judge in the first place. And if it were a legal issue that we're discussing, I would have every right to expect that you will follow the order of the court. Under 455, which is the first place we begin in recusal of a court. So in that case, I would probably have to accept the remand. And then you're hypothetical, you're being the sentencing judge again on the re-sentence. The difference between that and the situation with the magnets is that they had already decided by virtue of their comments that there was no border of judgementry that would stand because they had already determined that the magnets caused an unreasonable risk of injury or in the case, well, the substantial product hazard would have been the standard. And they had used those words, they tried to distinguish them, but they made it clear that they felt that the magnets, the very fact that they're saying in the case of Judge Whale after the rulemaking, that they're very happy that these magnets are either being recalled or are off the market, led me to believe that there was no way that they would agree with judgementry. So that's the distinction because they said so. And if in your hypothetical, Your Honor, you would have said, if the sentencing judge, okay, let's do it that way, he would have said, no matter what the Court of Appeals does, I'm going to go and re-sentence this person again the same way I did before, then I think I would have a reason to seek recusal. And that's more analogous to what we have here. Okay. Thank you very much. I appreciate you with those questions. Those are all the questions I have. So, Kevin, does he have any time left? No. Appellee's counsel's time has expired. All right. Thank you, counsel. So we'll, I think the appellate has, the time is discussed previously, so you may proceed with your rebuttal. Excuse me, Judge, should I give the appellate five minutes for rebuttal or three minutes? Give the appellate five minutes for rebuttal. Well, yeah, I think what we decided is to give the appellate a total of five minutes for rebuttal.  All right. And just to recap, because my intention at the end, and it was my fault, to stop the clock once the appellate or the appellee stops their presentation, because I consider the additional discussion the time of the panel rather than the advocate. So, appellate, you have five minutes for rebuttal. Ms. Willman? I apologize, Your Honor. I think I was on mute. Just wanted to address a few points on rebuttal. The characterization of those statements at issue as personal statements is just incorrect. The statements at issue were all part of official agency actions, the rulemaking and explanations for the rule, or the agency's enforcement of its recall order in district court adjudication. And there's nothing unfair about rulemaking and adjudication or even enforcement of a commission's order in district court and the commission participating in adjudication. And certainly, this court and the Supreme Court have said that repeatedly. Zen Magnets has focused in particular on strong statements made about matters in the course of the Leidecke case, which Zen Magnets invokes, and the United States v. Morgan, have stated clearly that in the case of Morgan, the fact that the Secretary not merely held but expressed strong views on matters believed by him to have been an issue did not unfit him for exercising his duty in subsequent proceedings. And there, the Secretary was commenting on federal court proceedings that had occurred not only not two, but three different times. And the Supreme Court held that the Secretary could fairly adjudicate or fairly reach a decision on remand the third time. And similarly, in Leidecke, not establishing bias or partiality or expressions of impatience, dissatisfaction, annoyance, and even anger, because those decision-makers are presumed to be able to decide the facts and legal issues before them fairly. Zen Magnets has never said those statements were unfair or improper as part of the rulemaking. And so it would be strange that those statements somehow were inappropriate with respect to the adjudication. The court has any further questions? I'd be happy to entertain those. Judge McHugh, do you have any questions? No, none here. All right. Judge Ide, do you have questions? No, I don't. Thank you. Okay. Thank you, Judge Ide. I don't have any questions either. This matter will be submitted. I appreciate the excellent written and oral advocacy of both counsel.